### IN THE UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| Howard Suh, individually and on behalf all others similarly situated, | Case No. 23-1338 |
| Plaintiff(s), | **CLASS ACTION COMPLAINT** |
| v. | **Demand For Jury Trial** |
| NCB Management Services, Inc., | |
| Defendant. | |

### CLASS ACTION COMPLAINT

Plaintiff(s) Howard Suh ("Plaintiff(s)") bring this action, on behalf of themselves and all others similarly situated, against Defendant NCB Management Services, Inc. ("NCB" or "Defendant"). Plaintiff(s) seek to obtain damages, restitution, and injunctive relief for a class of individuals ("Class" or "Class Members") who are similarly situated and have received notices of the data breach from NCB. Plaintiff(s) make the following allegations upon information and belief, except as to their own actions, the investigation of their counsel, and the facts that are a matter of public record.

### NATURE OF THE ACTION

1.     This class action arises out of a February 2023 data breach ("Data Breach") of documents and information stored on the computer network of NCB, a company that offers Accounts Receivable Management Solutions.[1]

2.     According to its website, NCB's goal "is to provide [clients] with increased collections while reducing your losses and improving your bottom line." It also claims to be "using

---

[1] https://ncbi.com/About (last visited Apr. 6, 2023).

a fully automated, state of the art collection system, the latest technology advancements, apply the highest in security standards and employ a well-trained, highly effective staff." [2]

3.    On its computer network, NCB holds and stores certain highly sensitive personally identifiable information ("PII" or "Private Information") of the Plaintiff(s) and the putative Class Members, who are consumers and, upon information and belief, employees, i.e., individuals who provided their highly sensitive and private information to NCB or its direct customers in exchange for loans, or other business services, or employment.

4.    According to the Notice of Data Breach Letter that NCB sent to Plaintiff(s) and Class Members, as well as those it sent to State Attorneys General, it first "discovered on February 4 that an unauthorized party gained access to NCB's systems on February 1" and began investigating. "It was confirmed on March 8th that some of your client information previously connected with your Bank of America credit card account was potentially obtained by the unauthorized party."[3]

5.    Thus, NCB did not realize for 3 days that the PII of Plaintiff(s) and Class was actively being accessed and acquired (also called exfiltrated) by cyber criminals.

6.    NCB finally began notifying approximately 494,969 victims on or about March 24, 2023, almost 2 months after the Data Breach began.[4]

7.    As a result of NCB 's Data Breach, Plaintiff(s) and thousands (if not more) of Class Members suffered ascertainable losses in the form of the loss of the benefit of their bargain, out-of-pocket expenses, and the value of their time reasonably incurred to remedy or mitigate the

---

[2] *See* https://ncbi.com/Financial.
[3] *See* Notice Letter
[4] https://apps.web.maine.gov/online/aeviewer/ME/40/3f5e6b09-62fb-4855-9077-65a7d8cc63d5.shtml

effects of the attack.

8.      The Data Breach was a direct result of Defendant's failure to implement adequate and reasonable cyber-security procedures and protocols necessary to protect Plaintiff(s) and Class Members' Private Information.

9.      Plaintiff(s) bring this class action lawsuit on behalf of those similarly situated to address Defendant's inadequate safeguarding of Class Members' Private Information that they collected and maintained, and for failing to provide timely and adequate notice to Plaintiff(s) and other Class Members that their information had been subject to the unauthorized access of an unknown third party and precisely what specific type of information was accessed.

10.     Defendant maintained the Private Information in a reckless manner. In particular, the Private Information was maintained on Defendant's computer network in a condition vulnerable to cyberattacks. The mechanism of the cyberattack and potential for improper disclosure of Plaintiff(s)' and Class Members' Private Information was a known risk to Defendant. Thus, Defendant was on notice that failing to take steps necessary to secure the Private Information from those risks left that property in a dangerous condition.

11.     Defendant disregarded the privacy and property rights of Plaintiff(s) and Class Members by, *inter alia*, intentionally, willfully, recklessly, or negligently failing to take adequate and reasonable measures to ensure its data systems were protected against unauthorized intrusions; failing to disclose that they did not have adequately robust computer systems and security practices to safeguard Class Members' Private Information; failing to take standard and reasonably available steps to prevent the Data Breach; and failing to provide Plaintiff(s) and Class Members prompt, accurate, and complete notice of the Data Breach.

12.     In addition, Defendant and its employees failed to properly monitor the computer

network and systems that housed the Private Information. Had Defendant properly monitored its computers, it would have discovered the intrusion sooner, and potentially been able to mitigate the injuries to Plaintiff(s) and the Class.

13.    Plaintiff(s)' and Class Members' identities are now at substantial and imminent risk because of Defendant's negligent conduct since the Private Information that Defendant collected and maintained (including Social Security numbers) is now in the hands of data thieves. Plaintiff(s) and Class Members must now and in the future closely monitor their financial accounts to guard against identity theft.

14.    Plaintiff(s) and Class Members may also incur out of pocket costs for, e.g., purchasing credit monitoring services, credit freezes, credit reports, or other protective measures to deter and detect identity theft.

15.    Through this Complaint, Plaintiff(s) seek to remedy these harms on behalf of themselves and all similarly situated individuals whose Private Information was accessed during the Data Breach (the "Class").

16.    Accordingly, Plaintiff(s) bring this action against Defendant for: (i) negligence, (ii) negligence per se, (iii) intrusion upon seclusion/ invasion of privacy, and (iv) unjust enrichment.

17.    Plaintiff(s) seek remedies including, but not limited to, compensatory damages, reimbursement of out-of-pocket costs, statutory damages, and injunctive relief including improvements to Defendant's data security systems, future annual audits, and adequate, long term credit monitoring services funded by Defendant, and declaratory relief.

## **PARTIES**

18.    Plaintiff Howard Suh is, and at all times relevant to this Complaint was, an individual citizen of the State of California, residing in the city of Los Angeles (Los Angeles

County). On or about March 24, 2023, Plaintiff Suh received a Notice of the Data Breach from NCB. A copy of the notice he received is dated March 24, 2022, attached as Exhibit A (the "Notice Letter").

19.     Defendant NCB Management Services, Inc. is a Pennsylvania based domestic business corporation, registered in Pennsylvania. NCB 's Principal Office is located at 1 Allied Drive, Trevose, Pennsylvania 19053. Defendant can be served through its registered agent, at 1 Allied Dr., Ste. 1 Trevose, Pennsylvania 19053-6945. All of Plaintiff(s)' claims stated herein are asserted against Defendant NCB, and any of its owners, predecessors, successors, subsidiaries, agents and/or assigns.

## JURISDICTION AND VENUE

20.     This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332(d) because this is a class action wherein the amount in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, there are more than 100 members in the proposed class, and at least one member of the class is a citizen of a state different from Defendant.

21.     The Court has general personal jurisdiction over Defendant because, personally or through its agents, Defendant operates, conducts, engages in, or carries on a business or business venture in Pennsylvania; it is registered with the Secretary of State in Pennsylvania as a Domestic Business Corporation; it maintains its headquarters in Trevose, Pennsylvania; and committed tortious acts in Pennsylvania.

22.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because it is the district within which NCB has the most significant contacts.

## STATEMENT OF FACTS

### *Nature of Defendant's Business*

23.    According to its website, NCB "has been an industry leader since 1994 in providing clients with a full-spectrum of Accounts Receivable Management (ARM) Solutions."[5]

24.    NCB covers collections in bank cards, installment loans, direct mail, retail cards, auto deficiencies, mortgage servicing, consumer lending, and commercial areas.[6]

25.    It services different industries such as: financial services, transportation, broadcast media, manufacturing, wholesalers, professional services, advertising, equipment rentals, distributors, entertainment, building materials, and IT & software.[7]

26.    NCB says it has state licenses in South Carolina, Florida, Nebraska, Pennsylvania, and South Dakota.[8]

27.    NCB collects PII of consumers from its clients who are seeking its financial and other services. This PII includes, *inter alia,* consumers' full names, multiple forms of contact information including phone numbers, addresses, and email addresses, Social Security numbers, and other financial and credit information.

28.    NCB, in the regular course of its business, collects and maintains the PII of consumers as a requirement of its business practices.

29.    Clients seeking its services entrusted NCB with consumers' PII with the mutual understanding that this highly sensitive private information was confidential and would be properly safeguarded from misuse and theft.

30.    NCB promises in it its Privacy Policy that it "will not share your information with any third party outside of our organization, other than as necessary to fulfill your request."[9]

---

[5] https://www.ncbi.com/Clients
[6] *Id.*
[7] https://www.ncbi.com/Commercial
[8] https://www.ncbi.com/StateLicenses
[9] https://www.ncbi.com/Content/NCB_Privacy_Policy.pdf (last visited Apr. 6, 2022).

31.    In the course of collecting Private Information from consumers, including Plaintiff(s) and Class Members, NCB promised to provide confidentiality and adequate security for Private Information through its applicable Privacy Policy and in compliance with statutory privacy requirements applicable to the financial services industry.

32.    Plaintiff(s) and the Class Members, as consumers, relied on the promises and duties of NCB to keep their sensitive PII confidential and securely maintained, to use this information for business purposes only, and to make only authorized disclosures of this information. Consumers, in general, demand that businesses that require highly sensitive PII will provide security to safeguard their PII, especially when their Social Security numbers, driver's license, state identification, and passports are involved.

33.    In the course of their dealings, Plaintiff(s) and Class Members provided (directly or indirectly) NCB with all or most of the following types of Private Information:

- First and last names;

- Home addresses;

- Email addresses;

- Phone numbers;

- Social Security numbers;

- Credit history; and

- Bank account or payment card information.

- Employment information

- IP address

- Military or veteran status

- Date of Birth

- Insurance information

- Gender[10]

34.     NCB had a duty to adopt reasonable measures to protect Plaintiff(s)' and Class Members' PII from unauthorized disclosure to third parties.

### ***The Data Breach***

35.     According to its Notice Letters, on February 4, 2023, NCB discovered that an unauthorized party gained access to NCB's systems on February 1, 2023[11]

36.     Notice Letters were not sent until late March 2023 despite NCB 's knowledge of the Data Breach since February.

37.     A review of various State Attorneys General websites shows that NCB began to notify State Attorney Generals of this Data Breach in late-March 2023, after statutory notification was required by the laws of the various states. Time is of the essence when trying to protect against identity theft after a data breach, so early notification is critical.[12]

38.     Because of this targeted, intentional cyberattack, data thieves were able to gain access to and obtain data from NCB that included the Private Information of Plaintiff(s) and Class Members.

39.     Upon information and belief, the Private Information stored on NCB 's network was not encrypted.

40.     Plaintiff(s)' Private Information was accessed and likely stolen in the Data Breach. Plaintiff(s) reasonably believe their stolen Private Information is currently available for sale on the Dark Web because that is the *modus operandi* of cybercriminals who target businesses that collect

---

[10]  https://www.ncbi.com/Content/NCB_Privacy_Policy.pdf
[11] Notice Letter, Ex. A.
[12]  https://apps.web.maine.gov/online/aeviewer/ME/40/65d544dc-79b0-437c-a7f8-757ffec624af.shtml (last accessed Apr. 6, 2023).

highly sensitive Private Information.

41.    As a result of the Data Breach, NCB now encourages Class Members to enroll in credit monitoring, fraud consultation, and identity theft restoration services, a tacit admission of the imminent risk of identity theft faced by Plaintiff(s) and Class Members.[13]

42.    That NCB is encouraging Plaintiff(s) and Class Members to enroll in credit monitoring and identity theft restoration services is an acknowledgment that the impacted consumers are subject to a substantial and imminent threat of fraud and identity theft.

43.    NCB had obligations created by contract, industry standards, and common law to keep Plaintiff(s)' and Class Members' Private Information confidential and to protect it from unauthorized access and disclosure.

44.    NCB could have prevented this Data Breach by, among other things, properly encrypting or otherwise protecting their equipment and computer files containing PII.

### *Defendant Acquires, Collects, and Stores PII*

45.    NCB acquires, collects, and stores a massive amount of PII of consumers for its business purposes as it provides financial services. Upon information and belief, NCB may not be properly deleting or destroying the PII records of its former customers and consumers for whom it no longer is providing services.

46.    By obtaining, collecting, and using Plaintiff(s)' and Class Members' PII for its own financial gain and business purposes, Defendant assumed legal and equitable duties and knew that it was responsible for protecting Plaintiff(s)' and Class Members' PII from disclosure.

47.    Plaintiff(s) and the Class Members have taken reasonable steps to maintain the confidentiality of their PII.

---

[13] Notice Letter, Ex. A.

48.    Plaintiff(s) and the Class Members relied on Defendant and its customers to keep their PII confidential and securely maintained, to use this information for business purposes only, and to make only authorized disclosures of this information.

### *The Data Breach was a Foreseeable Risk of which Defendant was on Notice*

49.    It is well known that PII, including Social Security numbers in particular, is a valuable commodity and a frequent, intentional target of cyber criminals. Companies that collect such information, including NCB, are well-aware of the risk of being targeted by cybercriminals.

50.    Individuals place a high value not only on their PII, but also on the privacy of that data. Identity theft causes severe negative consequences to its victims, as well as severe distress and hours of lost time trying to fight against the impact of identity theft.

51.    A data breach increases the risk of becoming a victim of identity theft. Victims of identity theft can suffer from both direct and indirect financial losses. According to a research study published by the Department of Justice, "[a] direct financial loss is the monetary amount the offender obtained from misusing the victim's account or personal information, including the estimated value of goods, services, or cash obtained. It includes both out-of-pocket loss and any losses that were reimbursed to the victim. An indirect loss includes any other monetary cost caused by the identity theft, such as legal fees, bounced checks, and other miscellaneous expenses that are not reimbursed (e.g., postage, phone calls, or notary fees). All indirect losses are included in the calculation of out-of-pocket loss."[14]

52.    Individuals, like Plaintiff(s) and Class Members, are particularly concerned with protecting the privacy of their Social Security numbers, drivers' license and state identification

---

[14] Erika Harrell, *Victims of Identity Theft, 2018*, U.S. Dep't of Just. (Apr. 2021, NCJ 256085), https://bjs.ojp.gov/content/pub/pdf/vit18.pdf (last visited Apr. 06, 2023).

numbers, and passport information which are the keys to stealing any person's identity and is likened to accessing your DNA for hacker's purposes.

53.    In 2021, there were a record 1,862 data breaches last year, surpassing both 2020's total of 1,108 and the previous record of 1,506 set in 2017.[15]

54.    Additionally in 2021, there was a 15.1% increase in cyberattacks and data breaches since 2020. Over the next two years, in a poll done on security executives, they have predicted an increase in attacks from "social engineering and ransomware" as nation-states and cybercriminals grow more sophisticated. Unfortunately, these preventable causes will largely come from "misconfigurations, human error, poor maintenance, and unknown assets."[16]

55.    Cyberattacks have become so notorious that the FBI and U.S. Secret Service have issued a warning to potential targets so they are aware of, and prepared for, and hopefully can ward off a cyberattack.

56.    According to an FBI publication, "[r]ansomware is a type of malicious software, or malware, that prevents you from accessing your computer files, systems, or networks and demands you pay a ransom for their return. Ransomware attacks can cause costly disruptions to operations and the loss of critical information and data."[17] This publication also explains that "[t]he FBI does not support paying a ransom in response to a ransomware attack. Paying a ransom doesn't guarantee you or your organization will get any data back. It also encourages perpetrators to target

---

[15] *Bree Fowler*, *Data breaches break record in 2021*, CNET (Jan. 24, 2022, 12:31 PM), https://www.cnet.com/tech/services-and-software/record-number-of-data-breaches-reported-in-2021-new-report-says/ (last visited Apr. 6, 2023).
[16] Chuck Brooks, *Alarming Cyber Statistics For Mid-Year 2022 That You Need To Know*, Forbes (June 3, 2022, 3:57 PM), https://www.forbes.com/sites/chuckbrooks/2022/06/03/alarming-cyber-statistics-for-mid-year-2022-that-you-need-to-know/?sh=176bb6887864 (last visited Apr. 6, 2023).
[17] *Ransomware*, FBI, https://www.fbi.gov/how-we-can-help-you/safety-resources/scams-and-safety/common-scams-and-crimes/ransomware (last visited Apr. 6, 2023).

more victims and offers an incentive for others to get involved in this type of illegal activity." [18]

57.    Despite the prevalence of public announcements of data breach and data security compromises, and despite its own acknowledgments of data security compromises, and despite its own acknowledgment of its duties to keep PII private and secure, NCB failed to take appropriate steps to protect the PII of Plaintiff(s) and the proposed Class from being compromised.

### NCB Had a Duty to
### Properly Secure Private Information

58.    At all relevant times, NCB had a duty to Plaintiff(s) and Class Members to properly secure their PII, encrypt and maintain such information using industry standard methods, train its employees, utilize available technology to defend its systems from invasion, act reasonably to prevent foreseeable harm to Plaintiff(s) and Class Members, and to promptly notify Plaintiff(s) and Class Members when NCB became aware that their PII was compromised.

59.    NCB had the resources necessary to prevent the Data Breach but neglected to adequately invest in security measures, despite its obligation to protect such information. Accordingly, NCB breached its common law, statutory, and other duties owed to Plaintiff(s) and Class Members.

60.    Security standards commonly accepted among businesses that store PII using the internet include, without limitation:

a.    Maintaining a secure firewall configuration;

b.    Maintaining appropriate design, systems, and controls to limit user access to certain information as necessary;

c.    Monitoring for suspicious or irregular traffic to servers;

[18] *Id.*

12

     d.     Monitoring for suspicious credentials used to access servers;

     e.     Monitoring for suspicious or irregular activity by known users;

     f.     Monitoring for suspicious or unknown users;

     g.     Monitoring for suspicious or irregular server requests;

     h.     Monitoring for server requests for PII;

     i.     Monitoring for server requests from VPNs; and

     j.     Monitoring for server requests from Tor exit nodes.

61.     The Federal Trade Commission ("FTC") defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority."[19] The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number."[20]

62.     The ramifications of NCB 's failure to keep consumers' PII secure are long lasting and severe. Once PII is stolen, particularly Social Security and driver's license numbers, fraudulent use of that information and damage to victims including Plaintiff(s) and the Class may continue for years.

### *The Value of Personal Identifiable Information*

63.     The PII of consumers remains of high value to criminals, as evidenced by the prices they will pay through the dark web. Numerous sources cite dark web pricing for stolen identity

---

[19] 17 C.F.R. § 248.201 (2013).
[20] *Id.*

credentials. For example, personal information can be sold at a price ranging from $40 to $200.[21]

64.    Criminals can also purchase access to entire company's data breaches from $900 to $4,500.[22]

65.    Social Security numbers, for example, are among the worst kind of personal information to have stolen because they may be put to a variety of fraudulent uses and are difficult for an individual to change. The Social Security Administration stresses that the loss of an individual's Social Security number, as is the case here, can lead to identity theft and extensive financial fraud:

> A dishonest person who has your Social Security number can use it to get other personal information about you. Identity thieves can use your number and your good credit to apply for more credit in your name. Then, they use the credit cards and don't pay the bills, it damages your credit. You may not find out that someone is using your number until you're turned down for credit, or you begin to get calls from unknown creditors demanding payment for items you never bought. Someone illegally using your Social Security number and assuming your identity can cause a lot of problems.[23]

66.    Attempting to change or cancel a stolen Social Security number is difficult if not nearly impossible. An individual cannot obtain a new Social Security number without evidence of actual misuse. In other words, preventive action to defend against the possibility of misuse of a Social Security number is not permitted; an individual must show evidence of actual, ongoing fraud activity to obtain a new number.

67.    Even a new Social Security number may not be effective, as "[t]he credit bureaus

---

[21] Anita George, *Your personal data is for sale on the dark web. Here's how much it costs,* Digital Trends (Oct. 16, 2019), https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs/ (last visited Apr. 6, 2023).
[22] *In the Dark*, VPNOverview (2019), https://vpnoverview.com/privacy/anonymous-browsing/in-the-dark/(last visited Apr. 6, 2023).
[23] Social Security Administration, *Identity Theft and Your Social Security Number*, *available at*: https://www.ssa.gov/pubs/EN-05-10064.pdf (last accessed Apr. 6, 2023).

and banks are able to link the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."[24]

68.     This data, as one would expect, demands a much higher price on the black market. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "[c]ompared to credit card information, personally identifiable information and Social Security Numbers are worth more than 10x on the black market."[25]

69.     PII can be used to distinguish, identify, or trace an individual's identity, such as their name and Social Security number. This can be accomplished alone, or in combination with other personal or identifying information that is connected or linked to an individual, such as their birthdate, birthplace, and mother's maiden name.[26]

70.     Given the nature of this Data Breach, it is foreseeable that the compromised PII can be used by hackers and cybercriminals in a variety of devastating ways. Indeed, the cybercriminals who possess Class Members' PII can easily obtain Class Members' tax returns or open fraudulent credit card accounts in Class Members' names.

71.     The Private Information compromised in this Data Breach is static and difficult, if not impossible, to change (such as Social Security numbers).

72.     Moreover, upon information and belief, NCB  has offered one year for identity theft monitoring and identity theft protection through Experian. Its limitation is inadequate when

---

[24] Brian Naylor, *Victims of Social Security Number Theft Find It's Hard to Bounce Back*, NPR (Feb. 9, 2015 4:59 AM), http://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-millions-worrying-about-identity-theft (last visited Apr. 6, 2023).
[25] Tim Greene, *Anthem Hack: Personal Data Stolen Sells for 10x Price of Stolen Credit Card Numbers*, Computer World (Feb. 6, 2015), http://www.itworld.com/article/2880960/anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html (last visited Apr. 6, 2023).
[26] *See* OFFICE OF MGMT. & BUDGET, OMB MEMORANDUM M-07-16 n.1 (last accessed Apr. 6, 2023).

Experian's victims are likely to face many years of identity theft.

73.    Furthermore, Defendant NCB 's credit monitoring offer and advice to Plaintiff(s) and Class Members squarely places the burden on Plaintiff(s) and Class Members, rather than on the Defendant, to monitor and report suspicious activities to law enforcement. In other words, NCB expects Plaintiff(s) and Class Members to protect themselves from its tortious acts resulting in the Data Breach. Rather than automatically enrolling Plaintiff(s) and Class Members in credit monitoring services upon discovery of the breach, Defendant merely sent instructions to Plaintiff(s) and Class Members about actions they can affirmatively take to protect themselves.

74.    These services are wholly inadequate as they fail to provide for the fact that victims of data breaches and other unauthorized disclosures commonly face multiple years of ongoing identity theft and financial fraud, and they entirely fail to provide any compensation for the unauthorized release and disclosure of Plaintiff(s)' and Class Members' PII.

75.    The injuries to Plaintiff(s) and Class Members were directly and proximately caused by NCB 's failure to implement or maintain adequate data security measures for the victims of its Data Breach.

### *NCB  Failed to Comply with FTC Guidelines*

76.    Federal and State governments have established security standards and issued recommendations to mitigate the risk of data breaches and the resulting harm to consumers and financial institutions. The FTC has issued numerous guides for business highlighting the importance of reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.[27]

---

[27] *Start With Security*, FTC (June 2015), https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf (last visited Apr. 6, 2023).

77.     In 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*, which established guidelines for fundamental data security principles and practices for business.[28] The guidelines note businesses should protect the personal consumer and consumer information that they keep, as well as properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct security problems.

78.     The FTC emphasizes that early notification to data breach victims reduces injuries: "If you quickly notify people that their personal information has been compromised, they can take steps to reduce the chance that their information will be misused" and "thieves who have stolen names and Social Security numbers can use that information not only to sign up for new accounts in the victim's name, but also to commit tax identity theft. People who are notified early can take steps to limit the damage."[29]

79.     The FTC recommends that companies verify that third-party service providers have implemented reasonable security measures.[30]

80.     The FTC recommends that businesses:

    a.     Identify all connections to the computers where you store sensitive information.

    b.     Assess the vulnerability of each connection to commonly known or reasonably foreseeable attacks.

    c.     Do not store sensitive consumer data on any computer with an internet

---

[28] *Protecting Personal Information: A Guide for Business*, FTC (Oct. 2016), hhttps://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf (last visited Apr. 6, 2023).

[29] *Data Breach Response*, FTC (Feb. 2021), https://www.ftc.gov/system/files/documents/plain-language/560a_data_breach_response_guide_for_business.pdf (last visited Apr. 6, 2023).

[30] *Start With Security*, FTC, *supra* note 32.

connection unless it is essential for conducting their business.

d.   Scan computers on their network to identify and profile the operating system and open network services. If services are not needed, they should be disabled to prevent hacks or other potential security problems. For example, if email service or an internet connection is not necessary on a certain computer, a business should consider closing the ports to those services on that computer to prevent unauthorized access to that machine.

e.   Pay particular attention to the security of their web applications—the software used to give information to visitors to their websites and to retrieve information from them. Web applications may be particularly vulnerable to a variety of hack attacks.

f.   Use a firewall to protect their computers from hacker attacks while it is connected to a network, especially the internet.

g.   Determine whether a border firewall should be installed where the business's network connects to the internet. A border firewall separates the network from the internet and may prevent an attacker from gaining access to a computer on the network where sensitive information is stored. Set access controls— settings that determine which devices and traffic get through the firewall—to allow only trusted devices with a legitimate business need to access the network. Since the protection a firewall provides is only as effective as its access controls, they should be reviewed periodically.

h.   Monitor incoming traffic for signs that someone is trying to hack in. Keep an eye out for activity from new users, multiple log-in attempts from unknown

users or computers, and higher-than-average traffic at unusual times of the day.

i.     Monitor outgoing traffic for signs of a data breach. Watch for unexpectedly large amounts of data being transmitted from their system to an unknown user. If large amounts of information are being transmitted from a business' network, the transmission should be investigated to make sure it is authorized.

81.     The FTC has brought enforcement actions against businesses for failing to protect consumer and consumer data adequately and reasonably, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

82.     Because Class Members entrusted NCB with their PII, NCB had, and has, a duty to the Plaintiff(s) and Class Members to keep their PII secure.

83.     Plaintiff(s) and the other Class Members reasonably expected that when they provide PII to NCB, it would safeguard their PII.

84.     NCB was at all times fully aware of its obligation to protect the personal and financial data of consumers, including Plaintiff(s) and members of the Class. NCB was also aware of the significant repercussions if it failed to do so. Its own Privacy Policy and Notice Letter, quoted above, acknowledges this awareness.

85.     NCB 's failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data—including Plaintiff(s)' and Class Members' first names, last names, addresses, and Social Security numbers, and other highly sensitive and confidential information—constitutes an unfair act or practice prohibited by Section 5 of the

FTCA, 15 U.S.C. § 45.

### *Plaintiff(s) and Class Members Have Suffered Concrete Injuries.*

86.     Plaintiff(s) and Class Members expected that Defendant would provide adequate security protections for their PII, and Class Members provided Defendant with sensitive personal information, including their names, addresses, and Social Security numbers.

87.     Defendant's poor data security deprived Plaintiff(s) and Class Members of the benefit of their bargain. Plaintiff(s) and other individuals whose PII was entrusted with NCB understood and expected that, as part of that business relationship, they would receive data security, when in fact Defendant did not provide the expected data security. Accordingly, Plaintiff(s) and Class Members received data security that was of a lesser value than what they reasonably expected. As such, Plaintiff(s) and the Class Members suffered pecuniary injury.

88.     Cybercriminals intentionally attack and exfiltrate PII to exploit it. Thus, Class Members are now, and for the rest of their lives will be, at a heightened and substantial risk of identity theft.  Plaintiff(s) have also incurred (and will continue to incur) damages in the form of, inter alia, loss of privacy and costs of engaging adequate credit monitoring and identity theft protection services.

89.     The cybercriminals who obtained the Class Members' PII may exploit the information they obtained by selling the data in so-called "dark markets" or on the "dark web." Having obtained these names, addresses, Social Security numbers, and other PII, cybercriminals can pair the data with other available information to commit a broad range of fraud in a Class Member's name, including but not limited to:

- obtaining employment;

- obtaining a loan;

- applying for credit cards or spending money;

- filing false tax returns;

- stealing Social Security and other government benefits; and

- applying for a driver's license, birth certificate, or other public document.

90. In addition, if a Class Member's Social Security number is used to create false identification for someone who commits a crime, the Class Member may become entangled in the criminal justice system, impairing the person's ability to gain employment or obtain a loan.

91. As a direct and/or proximate result of Defendant's wrongful actions and/or inaction and the resulting Data Breach, Plaintiff(s) and the other Class Members have been deprived of the value of their PII, for which there is a well-established national and international market.

92. Furthermore, PII has a long shelf-life because it contains different forms of personal information, it can be used in more ways than one, and it typically takes time for an information breach to be detected.

93. Accordingly, Defendant's wrongful actions and/or inaction and the resulting Data Breach have also placed Plaintiff(s) and the other Class Members at an imminent, immediate, and continuing increased risk of identity theft and identity fraud. Indeed, "[t]he level of risk is growing for anyone whose information is stolen in a data breach." Javelin Strategy & Research, a leading provider of quantitative and qualitative research, notes that "[t]he theft of SSNs places consumers at a substantial risk of fraud."[31] Moreover, there is a high likelihood that significant identity fraud and/or identity theft has not yet been discovered or reported. Even data that have not yet been

---

[31] Al Pascual, *The Consumer Data Insecurity Report: Examining The Data Breach- Identity Fraud Paradigm In Four Major Metropolitan Areas*, Nat'l Consumers League (June 2014), https://www.it.northwestern.edu/bin/docs/TheConsumerDataInsecurityReport_byNCL.pdf (last visited Apr. 6, 2023).

exploited by cybercriminals bears a high risk that the cybercriminals who now possess Class Members' PII will do so at a later date or re-sell it.

94.    As a result of the Data Breach, Plaintiff(s) and Class Members have already suffered injuries, and each are at risk of a substantial and imminent risk of future identity theft.

### *Data Breaches Put Consumers at an Increased Risk Of Fraud and Identify Theft*

95.    Data Breaches such as the one experienced Plaintiff(s) and Class are especially problematic because of the disruption they cause to the overall daily lives of victims affected by the attack.

96.    In 2019, the United States Government Accountability Office released a report addressing the steps consumers can take after a data breach.[32] Its appendix of steps consumers should consider, in extremely simplified terms, continues for five pages. In addition to explaining specific options and how they can help, one column of the chart explains the limitations of the consumers' options. *See* GAO chart of consumer recommendations, reproduced and attached as Exhibit B.  It is clear from the GAO's recommendations that the steps Data Breach victims (like Plaintiff(s) and Class) must take after a breach like Defendant's are both time consuming and of only limited and short-term effectiveness.

97.    The GAO has long recognized that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record," discussing the same in a 2007 report as well ("2007 GAO Report").[33]

98.    The FTC, like the GAO (*see* Exhibit B), recommends that identity theft victims

---

[32]  https://www.gao.gov/assets/gao-19-230.pdf (last accessed Apr 6, 2023). *See* attached as Ex. B.
[33] *See* "Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown," p. 2, U.S. Government Accountability Office, June 2007, https://www.gao.gov/new.items/d07737.pdf  (last accessed Apr. 6, 2023) ("2007 GAO Report").

take several steps to protect their personal and financial information after a data breach, including contacting one of the credit bureaus to place a fraud alert (consider an extended fraud alert that lasts for 7 years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.[34]

99.     Theft of Private Information is also gravely serious. PII/PHI is a valuable property right.[35]

100.     It must also be noted there may be a substantial time lag – measured in years -- between when harm occurs versus when it is discovered, and also between when Private Information and/or financial information is stolen and when it is used. According to the U.S. Government Accountability Office, which has conducted studies regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.

*See* 2007 GAO Report, at p. 29.

101.     Private Information and financial information are such valuable commodities to identity thieves that once the information has been compromised, criminals often trade the information on the "cyber black-market" for years.

102.     There is a strong probability that the entirety of the stolen information has been dumped on the black market or will be dumped on the black market, meaning Plaintiff(s) and Class Members are at an increased risk of fraud and identity theft for many years into the future. Thus,

---

[34] *See* https://www.identitytheft.gov/Steps (last accessed Apr. 6, 2023).
[35] *See, e.g.,* John T. Soma, et al, Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("PII") Equals the "Value" of Financial Assets, 15 Rich. J.L. & Tech. 11, at *3-4 (2009) ("PII, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets.") (citations omitted).

Plaintiff(s) and Class Members must vigilantly monitor their financial and medical accounts for many years to come.

### *Plaintiff Suh's Experience*

103.    Plaintiff Howard Suh is, and at all times relevant to this Complaint was, a resident and citizen of the State of California.

104.    Plaintiff Suh is not quite sure what his connection to NCB is other than NCB may have retrieved his information from one of its clients that he is affiliated with, Bank of America. Upon information and belief, NCB may have required a client of NCB to provide it with his PII, or received a payment for which he was required to provide PII. He is unsure of how NCB received his PII.

105.    On or about March 31, 2023, Plaintiff Suh received the Notice of Data Breach letter, which indicated that NCB had known about the Data Breach for months. The letter informed him that his PII was accessed by an unknown party. The letter stated that the impacted information may have included his name, Social Security number, address, phone number, email address, date of birth, employment position, pay amount driver's license number, and financial account information, but did not expand on whether additional information was stolen as well.

106.    Plaintiff Suh is alarmed by his Personal Information being accessed and stolen by an unknown cybercriminal, and even more by the fact that his PII was identified as among the breached data on NCB's computer system despite not being completely aware of his relationship to this company.

107.    Plaintiff Suh has already started to feel the effects from this Data Breach. He received an unauthorized bank charge to his Bank of America account in the amount of $34.99 on February 15, 2023. Given its timing relative to the Data Breach at NCB, he reasonably believes

that this fraudulent activity is related to the Data Breach.

108.    Plaintiff Suh has been receiving a combination of around 8 spam calls and many spam emails per day. He believes that the increased spam he is receiving is related to this Data Breach.

109.    Plaintiff Suh is concerned that the spam calls and texts are being placed with the intent of obtaining more personal information from him and committing identity theft by way of a social engineering attack. He has since felt the need to cancel his old phone number due to the constant spam and replace it with a new one in order to help prevent future instances.

110.    In response to NCB 's Notice of Data Breach, Plaintiff will be required to spend time dealing with the consequences of the Data Breach, which will continue to include time spent verifying the legitimacy of the Notice of Data Breach, exploring credit monitoring and identity theft insurance options, self-monitoring her accounts, and freezing his credit. He realizes he will likely have to spend about an hour a day verifying financial accounts to check for fraudulent activities. The time he is forced to spend monitoring and securing his accounts has been lost forever and cannot be recaptured.

111.    Immediately after receiving the Notice Letter, Plaintiff spent time discussing his options with a law firm and froze his debit card in response to the unauthorize charge in an effort to mitigate the damage caused by NCB.

112.    Plaintiff is very careful about sharing PII and has never knowingly transmitted unencrypted PII over the internet or any other unsecured source.

113.    Plaintiff suffered actual injury in the form of damages and diminution in the value of her PII—a form of intangible property that was entrusted to NCB.

114.    Plaintiff has suffered lost time, annoyance, interference, and inconvenience as a

result of the Data Breach and has anxiety and increased concerns for the loss of his privacy.

115.    Plaintiff Suh reasonably believes that his Private Information may have already been sold by the cybercriminals. Had he been notified of NCB 's breach in a timelier manner, he could have attempted to mitigate his injuries.

116.    Plaintiff Suh has suffered imminent and impending injury arising from the substantially increased risk of fraud, identity theft, and misuse resulting from his stolen PII being placed in the hands of unauthorized third parties and possibly criminals.

117.    Plaintiff has a continuing interest in ensuring that his PII, which upon information and belief remains backed up and in NCB 's possession, is protected and safeguarded from future breaches.

## CLASS ACTION ALLEGATIONS

118.    Plaintiff(s) bring this action on behalf of themselves and on behalf of all other persons similarly situated ("the Class") under Federal Rule of Civil Procedure 23.

119.    Plaintiff(s) propose the following Class definition, subject to amendment as appropriate:

> All persons whose Private Information was maintained on Defendant NCB's computer systems and compromised in its Data Breach that occurred in February 2023.

120.    Excluded from the Class are Defendant's officers and directors, and any entity in which Defendant has a controlling interest; and the affiliates, legal representatives, attorneys, successors, heirs, and assigns of Defendant. Excluded also from the Class are members of the judiciary to whom this case is assigned, their families and members of their staff.

121.    Plaintiff(s) hereby reserves the right to amend or modify the class definitions with greater specificity or division after having had an opportunity to conduct discovery.

122.    <u>Numerosity</u>. The Members of the Class are so numerous that joinder of all of them is impracticable. While the exact number of Class Members is unknown to Plaintiff(s) at this time, NCB notified the Attorneys General that approximately 494,969 individuals' data was compromised in Data Breach.

123.    <u>Commonality</u>. There are questions of law and fact common to the Class, which predominate over any questions affecting only individual Class Members. These common questions of law and fact include, without limitation:

    a.   Whether Defendant unlawfully used, maintained, lost, or disclosed Plaintiff(s)' and Class Members' Private Information;

    b.   Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

    c.   Whether Defendant's data security systems prior to and during the Data Breach complied with applicable data security laws and regulations;

    d.   Whether Defendant's data security systems prior to and during the Data Breach were consistent with industry standards;

    e.   Whether Defendant owed a duty to Class Members to safeguard their Private Information;

    f.   Whether Defendant breached its duty to Class Members to safeguard their Private Information;

    g.   Whether computer hackers obtained Class Members' Private Information in the Data Breach;

    h.   Whether Defendant knew or should have known that its data security systems

and monitoring processes were deficient;

i.   Whether Plaintiff(s) and Class Members suffered legally cognizable damages as a result of Defendant's misconduct;

j.   Whether Defendant's conduct was negligent;

k.   Whether Defendant's acts, inactions, and practices complained of herein amount to acts of intrusion upon seclusion under the law;

l.   Whether Defendant failed to provide notice of the Data Breach in a timely manner; and

m.   Whether Plaintiff(s) and Class Members are entitled to damages, civil penalties, punitive damages, and/or injunctive relief.

124.   <u>Typicality</u>. Plaintiff(s)' claims are typical of those of other Class Members because Plaintiff(s)'s Private Information, like that of every other Class Member, was compromised in the Data Breach.

125.   <u>Adequacy of Representation</u>. Plaintiff(s) will fairly and adequately represent and protect the interests of the Members of the Class. Plaintiff(s)' Counsel are competent and experienced in litigating class actions.

126.   <u>Predominance</u>. Defendant has engaged in a common course of conduct toward Plaintiff(s) and Class Members, in that all the Plaintiff(s)' and Class Members' Private Information was stored on the same computer systems and unlawfully accessed in the same way. The common issues arising from Defendant's conduct affecting Class Members set out above predominate over any individualized issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

127.   <u>Superiority</u>. A class action is superior to other available methods for the fair and

efficient adjudication of the controversy. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a class action, most Class Members would likely find that the cost of litigating their individual claims is prohibitively high and would therefore have no effective remedy. The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members, which would establish incompatible standards of conduct for Defendant. In contrast, the conduct of this action as a class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class Member.

128.    Defendant has acted on grounds that apply generally to the Class as a whole, so that class certification, injunctive relief, and corresponding declaratory relief are appropriate on a class-wide basis.

129.    Likewise, particular issues under Fed. R. Civ. P. 23(c)(4) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

    a.   Whether Defendant owed a legal duty to Plaintiff(s) and the Class to exercise due care in collecting, storing, and safeguarding their Private Information;

    b.   Whether Defendant's security measures to protect its data systems were reasonable in light of best practices recommended by data security experts;

    c.   Whether Defendant's failure to institute adequate protective security measures amounted to negligence;

    d.   Whether Defendant failed to take commercially reasonable steps to safeguard

consumer Private Information; and

e.    Whether adherence to FTC data security recommendations, and measures recommended by data security experts would have reasonably prevented the Data Breach.

130.    Finally, all Members of the proposed Class are readily ascertainable. Defendant has access to Class Members' names and addresses affected by the Data Breach. Upon information and belief, Class Members have already been preliminarily identified and sent notice of the Data Breach by NCB .

## CAUSES OF ACTION

### FIRST COUNT
**Negligence**
**(On behalf of Plaintiff(s) and All Class Members)**

131.    Plaintiff(s) re-allege and incorporate by reference the paragraphs above as if fully set forth herein.

132.    NCB  owed a duty to Plaintiff(s) and Class Members to exercise reasonable care in safeguarding and protecting their PII in its possession, custody, or control.

133.    Plaintiff(s) and the Class Members entrusted their PII to Defendant or its business associates with the understanding that Defendant would safeguard their information.

134.    NCB  had full knowledge of the sensitivity of the PII and the types of harm that Plaintiff(s) and Class Members could and would suffer if the PII were wrongfully disclosed.

135.    By assuming the responsibility to collect and store this data, and in fact doing so, and sharing it and using it for commercial gain, Defendant had a duty of care to use reasonable means to secure and safeguard its computer network—and Class Members' PII held within it—to prevent disclosure of the information, and to safeguard the information from theft.  Defendant's duty included a responsibility to implement processes by which it could detect a breach of its

security systems in a reasonably expeditious period of time and to give prompt notice to those affected in the case of a data breach.

136.    Defendant had a duty to employ reasonable security measures under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

137.    Defendant's duty to use reasonable care in protecting confidential data arose not only as a result of the statutes and regulations described above, but also because Defendant is bound by industry standards to protect confidential PII.

138.    Defendant breached its duties, and thus was negligent, by failing to use reasonable measures to protect Class Members' PII. The specific negligent acts and omissions committed by Defendant include, but are not limited to, the following:

a.    Failing to adopt, implement, and maintain adequate security measures to safeguard Class Members' PII;

b.    Failing to adequately monitor the security of its networks and systems;

c.    Failing to periodically ensure that its email system had plans in place to maintain reasonable data security safeguards;

d.    Allowing unauthorized access to Class Members' PII;

e.    Failing to detect in a timely manner that Class Members' PII had been compromised; and

f.    Failing to promptly notify Class Members of the breach so they might mitigate their damages and protect their Private Information.

139.    It was foreseeable that Defendant's failure to use reasonable measures to protect

Class Members' PII would result in injury to Class Members. Further, the breach of security was reasonably foreseeable given the known high frequency of cyberattacks and data breaches in the industry.

140.    It was therefore foreseeable that the failure to adequately safeguard Class Members' PII would result in one or more types of injuries to Class Members.

141.    There is a temporal and close causal connection between Defendant's failure to implement security measures to protect the PII and the harm suffered, and an imminent and substantial risk of harm that will be suffered by Plaintiff(s) and the Class.

142.    As a result of Defendant's negligence, Plaintiff(s) and the Class Members have suffered and will continue to suffer damages and injury including, but not limited to: out-of-pocket expenses associated with procuring robust identity protection and restoration services; increased risk of future identity theft and fraud, the costs associated therewith; time spent monitoring, addressing and correcting the current and future consequences of the Data Breach; and the necessity to engage legal counsel and incur attorneys' fees, costs and expenses.

143.    Plaintiff(s) and Class Members are entitled to compensatory and consequential damages suffered as a result of the Data Breach.

144.    Plaintiff(s) and Class Members are also entitled to injunctive relief requiring Defendant to, e.g., (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) continue to provide adequate credit monitoring to all Class Members.

**SECOND COUNT**
**Negligence *Per Se***
**(On Behalf of Plaintiff(s) and All Class Members)**

145.    Plaintiff(s) re-allege and incorporate by reference the paragraphs above as if fully

set forth herein.

146.    Section 5 of the FTCA prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Defendant's, of failing to use reasonable measures to protect PII. The FTC publications and orders described above also form part of the basis of Defendants' duty in this regard.

147.    NCB  violated Section 5 of the FTC Act by failing to use reasonable measures to protect PII and not complying with applicable industry standards. Defendants' conduct was particularly unreasonable given the nature and amount of PII it obtained and stored, and the foreseeable consequences of the Data Breach for companies of its type, including, specifically, the immense damages that would result to Plaintiff(s) and Members of the Class due to the valuable nature of the PII at issue in this case—including Social Security numbers.

148.    Defendants' violations of Section 5 of the FTCA constitute negligence per se.

149.    Plaintiff(s) and Members of the Class are within the class of persons that the FTCA was intended to protect.

150.    The harm that occurred as a result of the Data Breach is the type of harm the FTCA was intended to guard against. The FTC has pursued enforcement actions against businesses, which, as a result of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm as that suffered by Plaintiff(s) and Members of the Class.

151.    As a direct and proximate result of Defendant's negligence per se, Plaintiff(s) and Members of the Class have suffered and will suffer injury, including but not limited to: (i) actual identity theft; (ii) the loss of the opportunity how their PII is used; (iii) the compromise, publication, and/or theft of their PII; (iv) out-of-pocket expenses associated with the prevention,

detection, and recovery from identity theft, tax fraud, and/or unauthorized use of their PII; (v) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from tax fraud and identity theft; (vi) costs associated with placing freezes on credit reports; (vii) the continued risk to their PII, which remains in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect the PII of customers in its continued possession; and (viii) future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, and repair the impact of the PII compromised as a result of the Data Breach for the remainder of the lives of Plaintiff(s) and Members of the Class.

152.    Additionally, as a direct and proximate result of Defendants' negligence per se, Plaintiff(s) and Members of the Class have suffered and will suffer the continued risks of exposure of their PII, which remains in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect the PII in their continued possession.

153.    Plaintiff(s)' and Class Members' Private Information constitutes personal property that was stolen due to NCB 's negligence, resulting in harm, injury and damages to Plaintiff(s) and Class Members.

154.    NCB 's conduct in violation of applicable laws directly and proximately caused the unauthorized access and disclosure of Plaintiff(s)' and Class Members' unencrypted Private Information.

155.    Plaintiff(s) and Class Members have suffered and will continue to suffer damages

as a result of NCB 's conduct. Plaintiff(s) and Class Members seek damages and other relief as a result of NCB 's negligence.

### THIRD COUNT
**Intrusion Upon Seclusion / Invasion of Privacy**
**(On Behalf of Plaintiff(s) and All Class Members)**

156.    Plaintiff(s) re-allege the above allegations as if fully set forth herein.

157.    The State of Pennsylvania recognizes the tort of Intrusion upon Seclusion, and adopts the formulation of that tort found in the Restatement (Second) of Torts, which states:

> One who intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns, is subject to liability to the other for invasion of his privacy, if the intrusion would be highly offensive to a reasonable person.

*Restatement (Second) of Torts* § 652B (1977).

158.    Plaintiff(s) and Class Members had a reasonable expectation of privacy in the Private Information Defendant mishandled.

159.    Defendant's conduct as alleged above intruded upon Plaintiff(s)' and Class Members' seclusion under common law.

160.    By intentionally failing to keep Plaintiff(s)' and Class Members' Private Information safe, and by intentionally misusing and/or disclosing said information to unauthorized parties for unauthorized use, Defendant intentionally invaded Plaintiff(s)' and Class Members' privacy by:

    a.    Intentionally and substantially intruding into Plaintiff(s)' and Class Members' private affairs in a manner that identifies Plaintiff(s) and Class Members and that would be highly offensive and objectionable to an ordinary person; and

    b.    Intentionally publicizing private facts about Plaintiff(s) and Class Members, which is highly offensive and objectionable to an ordinary person; and

c.    Intentionally causing anguish or suffering to Plaintiff(s) and Class Members.

161.    Defendant knew that an ordinary person in Plaintiff(s)' or Class Members' position would consider Defendant's intentional actions highly offensive and objectionable.

162.    Defendant invaded Plaintiff(s)' and Class Members' right to privacy and intruded into Plaintiff(s)' and Class Members' private affairs by intentionally misusing and/or disclosing their Private Information without their informed, voluntary, affirmative, and clear consent.

163.    Defendant intentionally concealed from and delayed reporting to Plaintiff(s) and Class Members a security incident that misused and/or disclosed their Private Information without their informed, voluntary, affirmative, and clear consent.

164.    The conduct described above was at or directed at Plaintiff(s) and the Class Members.

165.    As a proximate result of such intentional misuse and disclosures, Plaintiff(s)' and Class Members' reasonable expectations of privacy in their Private Information was unduly frustrated and thwarted. Defendant's conduct amounted to a substantial and serious invasion of Plaintiff(s)' and Class Members' protected privacy interests causing anguish and suffering such that an ordinary person would consider Defendant's intentional actions or inaction highly offensive and objectionable.

166.    In failing to protect Plaintiff(s)' and Class Members' Private Information, and in intentionally misusing and/or disclosing their Private Information, Defendant acted with intentional malice and oppression and in conscious disregard of Plaintiff(s)' and Class Members' rights to have such information kept confidential and private. Plaintiff(s), therefore, seek an award of damages on behalf of themselves and the Class.

## FOURTH COUNT
### Unjust Enrichment

**(On Behalf of Plaintiff(s) and All Class Members)**

167.     Plaintiff(s) re-allege and incorporate by reference the paragraphs above as if fully set forth herein.

168.     Plaintiff(s) and Class Members conferred a monetary benefit on Defendant in the form of the provision of their PII and Defendant would be unable to engage in its regular course of business without that PII.

169.     Defendant appreciated that a monetary benefit was being conferred upon it by its customers on behalf of Plaintiff(s) and Class Members and accepted that monetary benefit.

170.     However, acceptance of the benefit under the facts and circumstances outlined above make it inequitable for Defendant to retain that benefit without payment of the value thereof. Specifically, Defendant enriched itself by saving the costs it reasonably should have expended on data security measures to secure Plaintiff(s)' and Class Members' Private Information. Instead of providing a reasonable level of security that would have prevented the Data Breach, Defendant instead calculated to increase its own profits at the expense of Plaintiff(s) and Class Members by utilizing cheaper, ineffective security measures. Plaintiff(s) and Class Members, on the other hand, suffered as a direct and proximate result of Defendant's decision to prioritize its own profits over the requisite data security.

171.     Under the principles of equity and good conscience, Defendant should not be permitted to retain the monetary benefit belonging to Plaintiff(s) and Class Members, because Defendant failed to implement appropriate data management and security measures.

172.     Defendant acquired the PII through inequitable means in that it failed to disclose the inadequate security practices previously alleged.

173.     If Defendant's customers had known that Defendant had not secured the PII it was

entrusted with, they would not have agreed to provide Plaintiff(s)' and Class Members' PII to Defendant.

174.    Plaintiff(s) and Class Members have no adequate remedy at law.

175.    As a direct and proximate result of Defendant's conduct, Plaintiff(s) and Class Members have suffered or will suffer injury, including but not limited to: (i) actual identity theft; (ii) the loss of the opportunity how their PII is used; (iii) the compromise, publication, and/or theft of their PII; (iv) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, and/or unauthorized use of their PII; (v) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from identity theft; (vi) the continued risk to their PII, which remain in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect PII in their continued possession; and (vii) future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, and repair the impact of the PII compromised as a result of the Data Breach for the remainder of the lives of Plaintiff(s) and Class Members.

176.    As a direct and proximate result of Defendant's conduct, Plaintiff(s) and Class Members have suffered and will continue to suffer other forms of injury and/or harm.

177.    Defendant should be compelled to disgorge into a common fund or constructive trust, for the benefit of Plaintiff(s) and Class Members, proceeds that they unjustly received for business services on their behalf.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff(s) pray for judgment as follows:

A.      For an Order certifying this action as a class action and appointing Plaintiff(s) and their counsel to represent the Class;

B.      For equitable relief enjoining Defendant from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of Plaintiff(s)' and Class Members' Private Information, and from refusing to issue prompt, complete and accurate disclosures of its Data Breach to Plaintiff(s) and Class Members;

C.      For equitable relief compelling Defendant to utilize appropriate methods and policies with respect to consumer data collection, storage, and safety, and to disclose with specificity the type of Private Information compromised during the Data Breach;

D.      For equitable relief requiring restitution and disgorgement of the revenues wrongfully retained as a result of Defendant's wrongful conduct;

E.      For declaratory relief as requested;

F.      Ordering Defendant to pay for long-term credit monitoring services for Plaintiff(s) and the Class;

G.      For an award of actual damages, compensatory damages, statutory damages, and statutory penalties, in an amount to be determined, as allowable by law;

H.      For an award of punitive damages, as allowable by law;

I.      For an award of attorneys' fees and costs, and any other expense, including expert witness fees;

J.      Pre- and post-judgment interest on any amounts awarded; and

K.      Such other and further relief as this Court may deem just and proper.

DATED this 6th day of April 2023.

Respectfully submitted,

_____
Benjamin F. Johns
Jonathon Shub
Samantha E. Holbrook
**SHUB & JOHNS LLC**
Four Tower Bridge
200 Barr Harbor Drive
Suite 400
West Conshohocken, PA 19428
Telephone: 610.477.8380
bjohns@shublawyers.com
jshub@shublawyers.com
sholbrook@shublawyers.com

Gary E. Mason
Danielle L. Perry
Lisa A. White*
**MASON LLP**
5101 Wisconsin Ave. NW, Suite 305
Washington, DC 20016
Telephone: 202.429.2290
gmason@masonllp.com
dperry@masonllp.com
lwhite@masonllp.com

*Attorneys for Plaintiff(s) and the proposed Class*

*pro hac vice applications for admission to be filed.*